## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CELLCAST TECHNOLOGIES, LLC and
ENVISIONIT LLC,

       Plaintiffs,

   v.

THE UNITED STATES,

       Defendant,

   and

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

       Third-party Defendant.

No. 15-1307

Judge Victor J. Wolski

## THE UNITED STATES' AND INTERNATIONAL BUSINESS MACHINES CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   OVERVIEW OF THE ASSERTED PATENTS & CLAIMS ............................ 2

   A.  The Disclosure of the Asserted Patents ............................................. 2

   B.  The Asserted Claims ........................................................................ 4

III.  TECHNOLOGICAL BACKGROUND ............................................................. 5

   A.  Emergency Broadcast System ("EBS") ............................................. 6

   B.  Emergency Alert System ("EAS") ..................................................... 6

   C.  2000 National Science and Technology Council ("NSTC") Report .............................. 7

   D.  Common Alerting Protocol (CAP) ..................................................... 9

IV.   LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ................................... 9

V.    PROPOSED CONSTRUCTIONS FOR DISPUTED TERMS ......................... 11

   A.  "Broadcast" ..................................................................................... 11

   B.  "Broadcast message" ....................................................................... 13

   C.  "Broadcast message record" / "broadcast request" / "broadcast message request" ....... 17

   D.  "Broadcast message originator" / "broadcast agent" ......................... 19

   E.  "Broadcast message originator identifier" ......................................... 22

   F.  "Broadcast message originator parameter" ........................................ 23

   G.  "Common Alerting Protocol (CAP)" ................................................ 25

   H.  "Generating a validated broadcast message record" ......................... 27

   I.   Claims 1 and 11-13 of the '938 Patent Are Invalid As Indefinite, Because The "Module" Terms Lack The Necessary Corresponding Structure ................................ 29

     1.  "broadcast admission control module" ....................................... 31

     2.  "broadcast message distributor module" .................................... 36

VI.   CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameranth, Inc. v. Menusoft Sys. Corp.*,
  No. 2-07-CV-271, 2010 WL 1610079 (E.D. Tex. Apr. 21, 2010) .........................................27

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)...................................................................................................15

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)...........................................................................................30, 31

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
  73 F.3d 1573 (Fed. Cir. 1996).....................................................................................................24

*Blackboard, Inc. v. Desire2Learn Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009)...................................................................................................40

*Chamberlain Group, Inc. v. Techtronic Indus. Co.*,
  No. 2016-2713, 2017 WL 360561 (Fed. Cir. Jan. 25, 2017)....................................................19

*Durel Corp. v. Osram Sylvania Inc.*,
  256 F.3d 1298 (Fed. Cir. 2001)...................................................................................................20

*E-Pass Techs., Inc. v. 3Com Corp.*,
  343 F.3d 1364 (Fed. Cir. 2003)...................................................................................................13

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
  785 F.3d 616 (Fed. Cir. 2015).....................................................................................................40

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012)...................................................................................................30

*Finisar Corp. v. DirecTV Group, Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008)...................................................................................................30

*Function Media, LLC v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013)........................................................................................30, 33, 38

*Hologic, Inc. v. SenoRx, Inc.*,
  639 F.3d 1329 (Fed. Cir. 2011)...................................................................................................16

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
  732 F.3d 1376 (Fed. Cir. 2013)...................................................................................................30

*Joao Bock Transaction Systems, LLC v. First Nat. Bank*,
No. 11 C 6472, 2013 WL 3199981 (N.D. Ill. June 24, 2013) ...........................................35, 36

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)...................................................................................................25

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003)................................................................................................37

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996).................................................................................................................10

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
800 F.3d 1366 (Fed. Cir. 2015)................................................................................................32

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)..........................................................................................19, 23

*Net MoneyIN, Inc. v. Verisign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)................................................................................................30

*New Railhead Mfg., LLC v. Vermeer Mfg.*,
298 F.3d 1290 (Fed. Cir. 2002)................................................................................................26

*Noah Sys., Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012).......................................................................................*passim*

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)................................................................................................11

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)................................................................................................25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005).......................................................................................*passim*

*Promethean Insulation Tech. LLC v. Sealed Air Corp.*,
No. 2:13-cv-1113-JRG-RSP, 2015 WL 11027039 (E.D. Tex. Oct. 25, 2015) .......................26

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
820 F.3d 419 (Fed. Cir. 2016)..................................................................................................25

*Speedtrack, Inc. v. Endeca Techs., Inc.*
, 524 F. App'x 651 (Fed. Cir. 2013) ........................................................................................16

*Suffolk Techs., LLC v. AOL Inc.*,
752 F.3d 1358 (Fed. Cir. 2014)................................................................................................27

*Telcordia Techs., Inc. v. Alcatel USA, Inc.*,
    No. 04-874-GMS, 2006 WL 6258253 (D. Del. June 22, 2006) ...............................................27

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ...........................................................................................................10

*Thorner v. Sony Comuter Entertainment Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...............................................................................13, 17, 22

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ...........................................................................................26

*Vehicle IP, LLC v. AT&T Mobility, LLC*,
    594 F. App'x 636 (Fed. Cir. 2014) ......................................................................................18

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006) ...........................................................................................13

*Vizio, Inc. v. ITC*,
    605 F.3d 1330 (Fed. Cir. 2010) ...........................................................................................26

*Wenger Mfg. v. Coating Machinery Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ...........................................................................................25

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015); ...............................................................................29, 30, 31

*Woods v. DeAngelo Marine Exhaust, Inc.*,
    692 F.3d 1272 (Fed. Cir. 2012) ...........................................................................................14

**Statutes**

35 U.S.C. § 112, ¶ 2 ..................................................................................................................10

35 U.S.C. § 112, ¶ 6 ............................................................................................................*passim*

35 U.S.C. § 154(a)(1) ................................................................................................................10

**Other Authorities**

47 C.F.R. § 11.31(d) ...................................................................................................................7

## I.    INTRODUCTION

Plaintiffs CellCast Technologies, LLC ("CellCast") and EnvisionIT LLC ("Envision") (collectively, Plaintiffs) accused Defendant the United States[1] of infringing U.S. Patent Nos. 7,693,938 ("the '938 patent"); 8,103,719 ("the '719 patent"); 8,438,221 ("the '221 patent"); 8,438,212 ("the '212 patent"); and 9,136,954 ("the '954 patent") (collectively, "the asserted patents") (attached as Exhibits 1-5).  Specifically, Plaintiffs allege that the government's Integrated Public Alert and Warning System ("IPAWS") system infringes the patents.  The IPAWS system provides public safety entities an effective way to alert the public about emergencies via broadcast, cable, satellite, wireline services, cell phones and other mobile devices, radio, and the Internet.

The asserted patents describe systems and methods for broadcasting messages to recipients within a particular area, and further describe the applicability of this technology to enhance public service warning systems by broadcasting messages to mobile telephones and other devices.  They also disclose "admission control for broadcasting messaging" to prevent unauthorized users from sending messages via the broadcast messaging system.

Of course, the concept of broadcasting messages from an authorized source is as familiar as the 17th century town crier.[2]  Moreover, during the post-September 11th environment in which the asserted patents were conceived, the public and private sectors were especially motivated to employ contemporary cellular technologies to improve existing emergency alerting

---

[1] After receiving a Rule 14 notice, Third-party Defendant International Business Machines Corporation ("IBM") answered the Complaint.  *See* Dkt. Nos. 18, 21.  The United States and IBM (collectively, "Defendants") jointly submit this brief regarding claim construction.

[2] Black's Law Dictionary (10th ed. 2014) (defining "town crier" as "*Hist.* (17c) A town officer responsible for making proclamations related to town business, usu. by walking the streets and shouting news, alerts, warning, etc.") (attached as Exhibit 6).

services.  This interest generated a substantial amount of technological, business and policy activity regarding emergency alerting.

Recognizing this crowded field of potentially invalidating prior art, Plaintiffs' proposed constructions attempt to narrow the scope of the asserted claim terms in ways that do not comport with the intrinsic record (*e.g.*, the patents and the official correspondence relating to their procurement, the prosecution history) or the understanding of a person of ordinary skill in the art ("POSA"), which understanding is the touchstone of claim construction.  As discussed in greater detail below in Sections V.A–H, because Defendants' proposed constructions hew closely to the intrinsic record and the controlling case law, Defendants' proposed constructions should be adopted.  Furthermore, Section V.I describes why certain claims of the '938 patent, which contain purely functional claim limitations, should be found to be invalid as indefinite.

## II.    OVERVIEW OF THE ASSERTED PATENTS & CLAIMS

### A.    The Disclosure of the Asserted Patents

The asserted patents generally relate to "message broadcast systems," "admission control for broadcast messaging," and "location-specific message broadcasting aggregator and gateways."  '938 patent at 1:17-19.[3]  Based on their disclosures and priority claims, the patents fall into two families: 1) the "'938 family," which includes the '938, '719 and '212 patents; and 2) the "'221 family," which includes the '221 and '954 patents.  The '938 family has a later effective filing date and includes more subject matter than the '221 family.[4]  But for claim construction purposes, the asserted patents largely share a common specification.  Accordingly,

---

[3] Citations to a patent will be to the column and lines of the patent. For example, "2:3-4" refers to column 2, lines 3-4 of a particular patent.
[4] For example, the specifications of the '938 family includes new Figures 11-15 and corresponding description ('938 patent at 34:26-38:62), boilerplate recitation of the claims ('938 patent at 17:59-23:62), and a "stunning feature" ('938 patent at 26:6-42).

unless differences in disclosure are material, citations in this brief will be to the '938 patent, with corresponding citations to the other patents being understood.

The patents describe, but do not identify, conventional "public service warning systems," which the patents dismiss as "antiquated" and for failing to provide "location-based notification or broadcasting messages." '938 patent at 1:31-35. The patents also allege "significant technical limitations" of subscription-based Short Message Service (SMS) for use in "mass messaging" to mobile phones. '938 patent at 1:36-2:2; '221 patent at 1:34-4:6. These limitations relate to delivery delays, congestion and call processing load. '938 patent at 1:42-56; '221 patent at 1:34-4:6. The '221 patent—but not the '938 patent[5]— concedes that an "alternative" to SMS, called "cell-based broadcasting" technology, was included in systems being deployed at the time. '221 patent at 3:65-4:6. In fact, the cell broadcast technology described by the '221 patent as being prior art *is* the enabling technology of the preferred embodiments of the asserted patents. *See* '938 patent at 4:58-62; '221 patent at 6:23-27 (describing "cell-broadcast SMS (C-BSMS) technology").



Turning to the alleged invention, the patents describe a "public service message location broadcasting system (PLBS)." The PLBS "receives emergency or public service messaging and identification of the target broadcast area from public

---

[5] As compared to the '221 patent, the later-filed '938 patent excises a substantial amount of background art discussion and pre-pends a disclaimer that the background discussion "may not constitute prior art." *Compare* '938 patent at 1:36-2:2 *with* '221 patent at 1:34-4:6.

service or government entities." '938 patent at 4:26-29.  Figure 1 (reproduced above) illustrates an embodiment of a PLBS.  '938 patent at 5:29-36.  In this figure, a public service location broadcast service bureau 102 (PLBS-SB, confusingly labeled as a "PSMBS Broadcast Broker Server") is accessed via a web interface.  *Id.* at 5:37-56.  The system "ensure[s] that the Broadcast Agents are authorized to send the requested broadcast messages to the defined broadcast target area."  *Id.* at 5:4-19.  "[I]nternal controls are provided to insure that "messages are authorized prior to transmittal."  *Id.*  A target area for a broadcast may be defined by having a Broadcast Agent "draw[] shapes or indicat[e] the areas on a map."  '938 patent at 26:43-47.

The PLBS "sends any public service or emergency information associated with an event, as determined by authorized messaging entities that may affect public safety," such as "utility outages, missing child alerts, severe weather warnings, flood warnings, and terrorist threat warnings."  '938 patent at 4:41-49.  "The messages are broadcast by public service message location broadcasting systems participating with local telecommunication networks and other local network operators."  *Id.*  As described above, the system uses cell broadcast technology. '938 patent at 4:58-62; '221 patent at 6:23-27.

## B.    The Asserted Claims

Despite descriptions in the patents about public alerting, the asserted claims of the asserted patents do not recite any limitations about what types of messages are broadcast or in what context.  Instead, the asserted claims of the asserted patents generally relate to systems and computer-implemented methods for broadcasting messages to recipients within a particular area. *See*, *e.g.*, '938 patent at 1:17-19.  In particular, the asserted claims describe either validating the authority of a person submitting the message, or validating the message based on the authority of the person submitting it.  *Id.*  This taxonomy is reflected in the chart below.

4

| Validating/Verifying Authority of Person Submitting The Message | Validating The Message Based On The Submitter's Authority |
|---|---|
| **'938 patent, claim 42**<br>**'719 patent, claim 23**<br><br>"validating the authority of a broadcast message originator" | **'938 patent, claim 1**<br>**'719 patent, claim 14**<br><br>"validating the broadcast message record as a function one or more of the broadcast message originator identifier, . . ." |
| **'221 patent, claim 19**<br>**'954 patent, claim 17**<br><br>"verifying an authority of the broadcast agent identification." | **'212 patent, claim 13**<br><br>"validating each broadcast message record as a function one or more of the broadcast message originator identifier and the broadcast target area of each broadcast message record." |

Among the asserted dependent claims, several also relate to validating/verifying authority: '938 patent, claims 11-12 and 57; '719 patent, claims 15 and 30; '212 patent, claim 14. The remainder of the asserted dependent claims relate to various aspects, such as broadcast message originator parameters, log files, managing a plurality of messages, and formatting.

## III.    TECHNOLOGICAL BACKGROUND

The asserted patents are based on applications first filed with the United States Patent & Trademark Office ("PTO") in November 2005 (for the '938 family) and in February 2004 (for the '221 family). By that time, the cell broadcast technology described in the patents was well-known.[6] Additionally, the benefits of updating government emergency alerting systems to take advantage of modern cellular technologies were also well recognized. The evolution of modern government emergency alerting systems, an important backdrop for the claimed inventions, is briefly recounted below.

---

[6] The '221 patent admits that cell broadcast technology is prior art, but the patent laments that "cell broadcasting systems and services have not been developed which effectively utilize the technology." '221 patent at 4:2-6; *see also* '221 patent at Fig. 1 ("Cell Broadcast Centre"); '938 at Fig. 1 and 6:25-29 ("A coupled network 112 may include a Cell Broadcast Center (CBC) 114"); 3GPP TS 23.041 V4.2.0 (Dec. 2001) (attached as Exhibit 7) at 9 (describing the functionality of the "CBC").

## A. Emergency Broadcast System ("EBS")

An early federal government national emergency notification system, the Emergency Broadcast System ("EBS"), was established in 1963 so the President could order public alerts to be broadcast on all TV and radio stations. *In the Matter of Amendment of Part 73, Subpart G, of the Commission's Rules Regarding the Emergency Broadcast System*, Report No. 94-288, 10 FCC Rcd. 1786 (F.C.C.) ¶¶ 4, 7-9 ("1994 FCC Report") (attached as Exhibit 8). EBS was an analog system that used a two-tone audio alert broadcast over radio stations. *Id.* Upon receipt of an attention signal by a decoder at a broadcast radio or TV station, an EBS station operator listened to the audio message to determine whether the message was a test or for an emergency. *Id.* If the message was for a national emergency, the operator had to alert the public, but if the message was for a state or local emergency, the operator could ignore or rebroadcast the message. *Id.* EBS had several disadvantages, including that EBS equipment did "not allow participants to alert the public selectively in the event of an emergency." *Id.* ¶12.

## B. Emergency Alert System ("EAS")

Recognizing the inadequacy of EBS, in 1994, the Federal Communications Commission ("FCC") created the Emergency Alert System ("EAS") to replace EBS. *Id.* ¶1. The requirements and protocols for EAS are codified at 47 C.F.R. § 11. EAS adopted digital technology. *See generally*, *id.* EAS had several advantages over EBS, including that it was compatible with modern digital communications systems. *Id.* ¶21 ("broadcast, cable, satellite, and other means to transmit digital information"). EAS required radio, TV and cable stations to participate, and allowed voluntary participation by the National Oceanic and Atmospheric Administration ("NOAA") National Weather Service ("NWS"), satellite communication systems, and pagers. *Id.* ¶¶40-72. The EAS protocol was "adaptable to a wide range of technologies and [would] accommodate voluntary participation by those entities" *Id.* ¶¶73-74,

130.  For example, the FCC permitted voluntary participation of high definition television (HDTV) as the technology came online.  *Id.* ¶74.  Moreover, "[t]elephone and cellular carriers may also voluntarily participate by providing communications links for EAS messages between emergency managers and broadcast stations and cable systems."  *Id.*

The 1994 FCC Report set forth a specific EAS signaling code and protocol.  *Id.* ¶¶78-79. A message to activate EAS has 4 parts: 1) digital header, including a preamble and EAS Header Codes; 2) an audio attention signal; 3) the audio, video, or text message; and 4) and End of Message ("EOM") code.  *Id.* ¶79 and App'x E, § 11.31.  The codes "who originated the emergency message, the nature of the emergency, the location of the emergency, and the valid time period of the emergency."  *Id.* ¶79 and App'x E, § 11.31; *see also* 47 C.F.R. § 11.31(d) (defining FIPS location codes).  "The location parameters can be for events affecting a whole state, a whole county, or a portion (down to 1/9th) of a county," and each EAS message can contain 31 location codes.  *Id.* ¶80.  Moreover, unique codes can alert "specific locales such as schools, hospitals, neighborhoods, a single block within a neighborhood, or individual homes." *Id.*  Overall, EAS codes would "allow system participants to relay EAS alerts to narrowly targeted audiences."  *Id.* ¶¶22, 94.

### C.     2000 National Science and Technology Council ("NSTC") Report

EAS certainly improved upon EBS, but by 2000, there was recognition by stakeholders that emergency and disaster warning systems still needed improvement.  In particular, the Working Group on National Disaster Information Systems within the National Science and Technology Council published a report, entitled *Effective Disaster Warnings* (attached as Exhibit 9) ("NSTC Report").  Driven by the observation that "disaster costs are high and rising," the report focused "on the needs for and the policy issues of implementing advanced technologies for delivering warnings to people at risk."  NSTC Report at 8, 11.  The report also recognized

that, although "[s]cientists are providing more and more warnings with increasing accuracy," "[w]arnings are effective only if they are accurate and result in appropriate action." *Id.* at 15, 18. And "[e]ffective warnings should reach, in a timely fashion, every person at risk who needs and wants to be warned." *Id.* at 6. Especially for state and local emergencies, the report found that many warnings were not relayed by stations reluctant to interrupt normal programming, and concluded that "EAS is not likely to function well as a vehicle for disseminating warnings as the number of warnings increases." *Id.* at 6-7, 29.

The NSTC Report encouraged "broad distribution" using government-owned systems and "all privately owned systems such as radio, television, pagers, telephones, the Internet, and printed media." *Id.* at 6. Although focused on policy issues, the report recognized that "[t]he technology exists . . . to add [the feature of a warning-receiving capability]" on a variety of communications devices. *Id.* Similarly, the NSTC Report recognized that cell broadcast technology was suitable for emergency alerting "to broadcast to all wireless telephones within a cell so that, for example, it is possible to track a tornado through a region, alerting only those within specific cells." *Id.* at 26.

The NSTC Report made several recommendations, including, the formation of working groups to develop and review on an ongoing basis "[a] single, consistent, easily-understood terminology that can be used as a standard across all hazards and situations"; "[a] single, consistent suite of variables to be included in a general digital message"; and "[t]he potential for widespread use of . . . technologies that do not interrupt commercial programs for transmitting emergency alerts." *Id.* at 7. The NSTC Report also recommended the development of a standard method to "collect and relay instantaneously and automatically all types of hazard warnings and reports locally, regionally, and nationally for input into a wide variety of dissemination systems."

*Id*. Arising from these recommendations, the Partnership for Public Warning ("PPW") was a non-profit institute that proposed a national "all-hazard public warning architecture." Partnership for Public Warning, "Developing a Unified All-Hazard Public Warning System," Nov. 25, 2002 ("PPW Report") (attached as Exhibit 10) at i. The PPW Report also recognized the benefits and feasibility of sending alerts to cell phones. *Id.* at 9, 24 (describing cell phones, wireless links, and 911 efforts that "make it possible to identify and then alert only persons in the area affected"). PPW also saw the need "to develop a single standard protocol for issuing alerts, notifications, and warnings for all types of hazards." *Id.* at 24, App'x 2.

### D.    Common Alerting Protocol (CAP)

In 2001, an international working group of emergency managers and IT and telecommunications experts adopted the NSTC Report recommendations "as a point of departure for the design of a Common Alerting Protocol (CAP)." CAP v1.2 (attached as Exhibit 11) at § 1.2. PPW endorsed[7] the CAP initiative in 2002. And in 2003, a draft CAP specification was submitted to the standards process of a non-profit consortium, called Organization for the Advancement of Structured Information Standards ("OASIS"). *Id*. CAP provides an open, non-proprietary digital message format for exchanging emergency alerts and public warnings over many different types of networks. *Id.* at Abstract, § 1.1. "The primary use of a CAP Alert Message is to provide a single input to activate all kinds of alerting and public warning systems." *Id.* at § 1.4. CAP Alert Messages can be delivered directly to recipients using data broadcasts. *Id.* at §§ 1.4, 2.2 (describing "one-way 'broadcast' channels").

## IV.    LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

Each patent "shall conclude with one or more claims particularly pointing out and

---

[7] PPW used CAP v.0.5 as a "straw man" for its 2002 analysis. PPW Report (Exhibit 10) at 26, App'x 2.

distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112, ¶ 2 (Pre-AIA). The claims of a patent define the scope of the patent grant, which is "the right to exclude others from making, using, offering for sale, or selling the [claimed] invention." 35 U.S.C. § 154(a)(1); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). The interpretation of the claims is for the court to determine, even where the construction has evidentiary underpinnings. *Markman*, 517 U.S. at 372, 390; s*ee Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015).

The words of a claim "'are generally given their ordinary and customary meaning,'" which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention (*i.e.*, the effective filing date of the patent application).[8] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The claim itself provides "substantial guidance" about the meaning of the terms within it and often provides a firm basis for construing a term. *Phillips*, 415 F.3d at 1314. Other claims can also illuminate the meaning of a claim term, as claim terms are typically used consistently within a patent, and differences between claims can also inform on the meaning of a term. *Id.* The "claims . . . do not stand alone," however, and "must be read in view of the patent's specification." *Id.* at 1315 (internal quotations omitted); *Markman*, 517 U.S. at 389 ("[A claim] term can be defined only in a way that comports with the

---

[8] Defendants propose that a person of ordinary skill in the art relevant to the asserted patents would have the following qualifications: Either a bachelor's degree in computer science, engineering, physics, mathematics, or a related field, as well as some years of practical experience designing, developing, or maintaining standards-based cellular messaging systems, such as text messaging or emergency alerting systems; or significant practical experience designing, developing, or maintaining broadcast messaging systems, such as emergency alerting systems. This person would have access to and/or collaborate, as needed, with individuals in other areas, such as computer or software programming, cellular network technology, and public alert or warning systems.

instrument as a whole.").

The specification necessarily informs the proper construction of the claims. *Phillips*, 415 F.3d at 1316. Thus, courts may "rely heavily" on the specification for guidance as to what the claims mean. *Id.* at 1316-17. Moreover, the prosecution history, which consists of the complete record of the proceedings before the U.S. Patent & Trademark Office ("PTO"), provides evidence of how the PTO and the inventor understood the patent. *Id.* at 1317.

Finally, the Court may consider extrinsic evidence, such as technical dictionaries. *Id.* at 1318. Although extrinsic evidence is less significant than the claims, specification, and prosecution history in construing the claims, technical dictionaries are recognized as a tool that the Court may consider in the context of the intrinsic record. *Id.* at 1318-19.

## V.   PROPOSED CONSTRUCTIONS FOR DISPUTED TERMS

### A.   "Broadcast"

| CLAIMS | DEFENDANTS' CONSTRUCTION | PLAINTIFFS' CONSTRUCTION |
|---|---|---|
| **'938 patent**: 1, 11, 12, 13, 42, 47, 57<br><br>**'719 patent**: 14, 15, 23, 27, 30<br><br>**'221 patent**: 19<br><br>**'212 patent**: 13, 14, 15, 20<br><br>**'954 patent**: 17, 23 | wide dissemination over a communications network including, but not limited to, cellular carriers, digital private radio systems, private radio systems, internet, wireline telecommunications, satellite, and CATV systems | Plaintiffs contend that "broadcast" need not be construed because other encompassing terms already include it – such as: "broadcast message," "broadcast message record," and others below.<br><br>However, to the extent the Court elects to construe "broadcast": transmission to all recipients within a target area without targeting a specific recipient |

The parties disagree whether the Court should construe the term "broadcast." Because they also disagree on the meaning of this term, it must be construed. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (holding that a court must resolve "an actual dispute regarding the proper scope" of claims). The dispute here is whether

the broad, general term "broadcast" should have its plain and ordinary meaning in view of the intrinsic evidence, as Defendants propose, or a narrower construction based on the disclosed embodiments of claimed invention, as Plaintiffs propose.

Defendants' proposed construction aligns with how the specifications of the asserted patents states broadcast messages are transmitted according to the disclosed inventions: "In most cases, the message is transmitted to every known operator offering coverage of the area and may include mobile carriers, digital private radio systems operators, private radio system operators, internet service providers, wireline telecommunication service providers, satellite service providers, CATV operators, etc." *See* '938 patent at 14:49-54; '221 patent at 12:49-54. Defendants' proposed construction also comports with the breadth of transmission types reflected in the relevant extrinsic evidence. For example, *Newton's Telecom Dictionary* (19th ed. 2003) defines "Broadcast" as "1. To send information to two or more receiving devices simultaneously – over a data communications network, voice mail, electronic mail system, local TV/radio station or satellite system." (Exhibit 12 at 124.)

Defendants expect Plaintiffs to criticize Defendants' proposal in this case for including "cellular carriers." For example, in *inter partes* review proceedings before the PTO regarding the asserted patents, Plaintiff EnvisionIT, LLC (the entity that owns the asserted patents) criticized a similar construction of "broadcast" proposed in those proceedings by the government, because it encompassed Short Message Service (SMS), commonly referred to as text messaging, which purportedly the asserted patents disparaged. *See, e.g.*, IPR2017-00183, Patent Owner's Preliminary Response (POPR) at 15-16 (excerpts attached as Exhibit 13) (arguing that SMS messages were disclaimed because "[t]he '938 patent contains only disparaging remarks with respect to SMS messages"). Each portion of the specification that

Plaintiffs identify in support for this argument, however, contains the kind of general statements about the background of the invention that the Federal Circuit repeatedly has found to be insufficient to narrow the common meaning of a claim term. *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1180 (Fed. Cir. 2006) (refusing to find that "general statements" about deficiencies in prior art surrendered claim scope); *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them."). Indeed, the technology allegedly used by the patents is referred to as "cell-broadcast SMS." '938 patent at 4:59.

Defendants' proposal for "broadcast" is consistent with how the term is used throughout the asserted patents, and how a person of ordinary skill would understand that term in view of the claim language and the intrinsic evidence. *See Phillips*, 415 F.3d at 1315-17. The inventors did not redefine "broadcast" to have a meaning other than its usual meaning, nor did they clearly and unmistakably disavow the full scope of the term "broadcast." *See Thorner v. Sony Comuter Entertainment Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) (patentee must "clearly express an intent to redefine the term" to act as his own lexicographer).

### B. "Broadcast message"

| CLAIMS | DEFENDANTS' CONSTRUCTION | PLAINTIFFS' CONSTRUCTION |
|---|---|---|
| **'938 patent**: 1, 11, 42<br>**'719 patent**: 14, 23<br>**'221 patent**: 19<br>**'212 patent**: 13, 14, 20<br>**'954 patent**: 17 | a message that is intended for distribution | message that is intended for distribution to all recipients within a target area and is not targeted to a specific recipient |

Both parties agree that in the context of the asserted patents a person of ordinary skill in the art would understand that the term "broadcast message" refers to a "message that is intended

for distribution," which is the term's plain and ordinary meaning[9] and consistent with both the intrinsic and extrinsic evidence. The dispute concerning the "broadcast message" term is whether the construction should end there, as Defendants propose, or further specify that the message is "to all recipients within a target area and is not targeted to a specific recipient," as Plaintiffs propose. As explained below, the additional limitation that Plaintiffs seek to read into the claims contradicts the intrinsic evidence.

The intrinsic evidence shows that the "broadcast message" term refers only to the content of the message and does not include Plaintiffs' proposed "to all recipients within a target area and is not targeted to a specific recipient" limitation. For instance, a cursory review of the asserted claims shows that the term "broadcast message" is not so limiting. All claims reciting the "broadcast message" term already recite a "broadcast target area" limitation. *See, e.g.*, '938 patent at cl. 1 ("A message broadcasting system providing a ***broadcast message*** to a ***broadcast target area*** . . ."); '719 patent at cl. 14 (". . . receiving a broadcast message record having a ***broadcast message***, a defined ***broadcast target area***, and a broadcast message originator identifier . . ."); '954 patent at cl. 17 (". . . receiving over an input interface a plurality of broadcast message requests, each broadcast message request including . . . a geographically defined broadcast ***target area, and a broadcast message*** . . .").[10] The Court should decline to read into a term a limitation that already is expressly recited in the language of at least some claims. *See Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1285 (Fed. Cir. 2012) (error to construe "angularly disposed" as requiring neither parallel nor perpendicular

---

[9] *Newton's Telecom Dictionary* (Exhibit 12) at 665 (defining "broadcast message" as "[a] message from one user sent to all users").
[10] Emphasis in quotations of the asserted patents and related prosecution histories is added unless otherwise specified.

orientation, where plain language did not "prescribe any specific angle" and "every claim that uses this term already limits the ring to being directed toward the outer wall").

Moreover, Plaintiffs' proposal that a "broadcast message" be "intended for distribution to *all* recipients within a target area" is inconsistent with the plain language of claim 1 of the '938 patent and claim 19 of the '221 patent, which recite "distributing the broadcast message to *at least a portion* of the broadcast target area" and "transmitting the broadcast message over an output interface to one or more coupled broadcast message networks providing broadcast message alerting service to *at least a portion of the broadcast target area*," respectively. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1305 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (rejecting construction that contradicted express claim language directed to an analyzer server "it read[]'analyzer server' out of the claim").

Also, the specifications of the asserted patents disclose that the "broadcast message" is a separate concept from its intended target area. Specifically, the specifications explain that the "broadcast message" is the content of the emergency alert to be distributed, irrespective of the intended target: "A Broadcast Message may consist of 15 82-character messages linked together. The standard default maximum size of a message may be that used by second generation GSM systems, which is 93 characters, or 82 octets of data." '938 patent at 9:26-10:3 (referring to character length and contents of message, including multimedia). Similarly, the specifications state that "[a] mobile unit . . . receives the broadcast message and displays the message on its screen," again indicating that the "message" refers to the content of the message intended for distribution and not more. *See* '938 patent at 4:10-14; '221 patent at 5:45-49. Meanwhile, the specifications explicitly distinguish between "a broadcast message and local

15

delivery instructions," showing that the defined target is not inherent to the message itself.  *See* '938 patent at 6:25-29.  *See Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1334-38 (Fed. Cir. 2011) (construing "asymmetrically located" as requiring that it not be located on the longitudinal axis, where specification supported construction and similar limitation in another claim specifically required longitudinal asymmetry).

The distinction between a broadcast message and its intended area of distribution is also supported by the applicants' characterization of their alleged invention during prosecution.  For instance, during prosecution of the application that issued as the '221 patent, the applicants stated that the claimed system "receives the broadcast request with the particular message to be broadcast *and* the geographically defined target area for that particular message to be broadcast into."  Appl. No. 13/311,448, Oct. 24, 2012 Am. A – Response to Office Action, attached as Exhibit 14, at 14; *see also id.* at 22 ("[Pending] Claim 13 recites that the broadcast request that is received by the service bureau that includes the broadcast message to be sent and the target area from the broadcast agent . . .").  Similarly, during prosecution of the application that issue as the '954 patent, the applicants stated that "each broadcast request . . . has a unique broadcast message and broadcast target area."  Appl. No. 13/887,940, Feb. 2, 2015 Am. A – Response to Office Action, attached as Exhibit 15, at 12.  In other words, according to the applicants, the broadcast message request contains both a broadcast message and a separate defined target area. *See id.* at 22 (defining "the broadcast request" to include, *inter alia*, "the geographically defined broadcast target area" and "a broadcast message").  The prosecution history therefore establishes that the applicants considered the message to be a distinct concept from the target area or intended recipients.  *See Speedtrack, Inc. v. Endeca Techs., Inc.*¸ 524 F. App'x 651, 655-56 (Fed.

Cir. 2013) (distinguishing claim terms used distinctly by patentee in claims, specification, and prosecution history).

Because nothing in the intrinsic evidence supports importing Plaintiffs' proposed limitation into the claims, the Court should reject Plaintiffs' construction. Defendants' proposed construction of the term "broadcast message," in contrast, is the plain and ordinary meaning of the term and is consistent with how the term is used in the intrinsic record. *See Phillips*, 415 F.3d at 1315–17; *Thorner*, 669 F.3d at 1366–67 ("We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer."). The Court therefore should adopt Defendants' proposed construction.

C.    **"Broadcast message record" / "broadcast request" / "broadcast message request"**

| CLAIMS | DEFENDANTS' CONSTRUCTION | PLAINTIFFS' CONSTRUCTION |
|---|---|---|
| **'938 patent**: 1, 42, 47, 57<br>**'719 patent**: 14, 23, 30<br>**'221 patent**: 19<br>**'212 patent**: 13, 15, 20<br>**'954 patent**: 1, 4, 17 | data associated with a proposed broadcast message | a populated data structure that includes a broadcast message (as construed) and associated information |

Defendants' proposed construction for the terms "broadcast message record," "broadcast request," and "broadcast message requests"—"data associated with a proposed broadcast message"—is consistent with how those terms are used in the intrinsic evidence. Indeed, the parties generally agree that the terms relate to the recited "broadcast message" and contain data or information "associated" with the broadcast message.

The specifications state that the "objective of the Web Portal 202" is to create a "Broadcast Request," which is described as "a file which holds the following information.

    a.   Broadcast Target Area/Footprint

    b.   Broadcast Message and related parameters

    c.   User Parameters (*e.g.*, Broadcast Agent User ID and Password)

    d.   Status of the Broadcast Request, (times Proposed, Authenticated, Handed off) and status reports."

'938 patent at 15:48-59.  The specifications also disclose other types of data as associated with a Broadcast Request, including "the name, the current system date and time," "a check list of flags that are used by the system to track the progress of each Broadcast Request," and "an end of file marker."  *See*, *e.g.*, '938 patent at 16:4-36, 17:1-8, 24:43-61.  In other words, the "Broadcast request" is an "object" or "file" that "details everything known about each proposal."  '938 patent at 17:1-5.  This association of data with a proposed message is consistent with the notion of a "record."  *See* '938 at 16:4-6 (describing a "Broadcast Request record"); *Newton's Telecom Dictionary* (Exhibit 12) at 665 (defining "Record" as "In a database, a record is a group of related data items treated as one unit of information – for example, your name, address and phone number. Each Record is made up of several fields.  A field is simply your last name.").

       Plaintiffs' proposed construction seeks to read into the terms an additional limitation—a "populated data structure"—that describes the way the data is organized and formatted by the underlying system.  Nothing in the intrinsic evidence, however, suggests that the patentees intended to limit the terms "broadcast message record," "broadcast request," and "broadcast message requests" to "populated data structures."  Indeed, neither the claims nor specifications use the terms "populated" or "data structure."  Nor was "data structure," let alone "populated data structure," a term used to describe the claimed invention during prosecution.  *Vehicle IP, LLC v. AT&T Mobility, LLC*, 594 F. App'x 636, 642 (Fed. Cir. 2014) (rejecting proposed construction of "expected time of arrival" as requiring "clock-time format" where intrinsic

evidence never limited the disputed term to clock-time format); *see also Chamberlain Group, Inc. v. Techtronic Indus. Co.*, No. 2016-2713, 2017 WL 360561, at *4 (Fed. Cir. Jan. 25, 2017) (rejecting construction where limiting language was used "only once" in the written description, and even then "[t]hat usage makes clear that [the claim term] does not need to be [so limited].").

     D.     **"Broadcast message originator" / "broadcast agent"**

| CLAIMS | DEFENDANTS' CONSTRUCTION | PLAINTIFFS' CONSTRUCTION |
|---|---|---|
| **'938 patent**: 1, 11, 12, 13, 42<br>**'719 patent**: 14, 15, 23, 27<br>**'221 patent**: 19<br>**'212 patent**: 13, 14, 15<br>**'954 patent**: 1, 17, 23 | a person who submitted a proposed broadcast message | a person or entity that requests the transmission of a broadcast message |

The parties agree that "broadcast message originator" and "broadcast agent" are similar terms that should be construed the same. The parties differ, however, on the meaning of these terms. Defendants propose that the agent and originator be construed as "a person who submitted a proposed broadcast message." The specifications "repeatedly and consistently" refer to the originator and agent as a person, rather than a group or entity. *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004) (construing claims as excluding communications over the Internet because the specification "repeatedly and consistently describe[d] the local and remote systems of the claimed inventions as communicating directly over a telephone line"). For instance, the specifications consistently refer to the agent or originator as "he" or a "man":

- "Service may be automatically denied to a Broadcast Agent . . . who has exceeded ***his*** quota. . . . This may cause the Broadcast Agent to think again about conserving ***his*** quota if near the limit." ('938 patent at 7:64-8:4; '221 patent at 8:8-14);

- "The Broadcast Agent may not be able to read and write the message in the other language, for example, *he* may not read Chinese or Arabic.  In this case, *he* can go to the library of message . . ." ('938 patent at 10:35-39; '221 patent at 10:38-43);

- "The web portal 202 provides a ***man-machine interface*** to a Broadcast Agent utilizing a Broadcast Agent access device . . ." ('938 patent at 12:33-35);

- "Each registered Broadcast Agent, that is ***everyone*** who is allowed to create Broadcasts . . ." ('938 patent at 16:55-57; '221 patent at 14:42-44);

- "A Broadcast Agent may feel that the security of *his* account profile has been breached . . . as *he* is receiving reports from the Reporting System of activity in *his* account that the Broadcast Agent did not originate.  In such cases, *he* may temporarily suspend *his* account . . . The Broadcast Agent achieves this by 'suspending' (disabling) *his* account profile . . ." ('938 patent at 26:7-16); and

- "The PLBS system 100 can display a map to the Broadcast Agent as a function of the user ID and *his* authorized jurisdiction." ('938 patent at 29:16-18).

The patents also provide examples of certain individual persons who may be message originators or agents, such as "a Coast Guard commander," "a River Authority manager," "personnel within a police department or fire department," or a "senior police officer[] or disaster manager."  '938 patent at 7:14-29, 8:25-32, 33:64-67.  Specifically, the specifications also disclose that a "Broadcast Agent Administrator" may set "restrictions or rules related to . . . one or more Broadcast Agents under its control or within its Broadcast Message Jurisdiction. For example, it may establish different levels of authority for various personnel within a police department or fire department or allocate sub-areas or sub-jurisdictions based on police or fire department sub-boundaries."  '938 patent at 8:25-32; '221 patent at 8:34-41.  Indeed, the specifications refer to the "Broadcast Agent's organization," thereby distinguishing between the broadcast agent and the organization of which he is a member.  '938 patent at 7:17; *see also* '938 patent at 10:5-12 (referring to a "group of Broadcast Agents").  *See Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1303-04 (Fed. Cir. 2001) (construing "oxide coating" as a

"primarily compris[ing] metal oxide compounds" because all of the examples in the specification contained only metal cations and oxygen).

Recognizing Broadcast Agents at the level of a single person—not just an entity/organization—enables the hierarchical authorization scheme that is a critical part of the patents' "admission control" method.  For example, "[t]he Administrative Operator also establishes within the system an Administration Database to set account parameters so that Broadcast Agent Administrators and their Broadcast Agents have *defined authorization levels*." '938 patent at 27:29-32.  In turn, "[t]he Broadcast Agent Administrator (or *his* delegate) has *under his control* several Broadcast Agent accounts, which have authority under *him*, but no greater authority."  *Id.* at 7:9-12.  Additionally, the Broadcast Agent Administrator "may establish *different levels of authority* for various *personnel within* a police department or fire department."  *Id.* at 8:28-31.  These permissions directly impact admission control and the ability to transmit messages.  *Id.* at 15:51-61 ("The Admission Control 220 ensures that that any Broadcast Request meets with the approval based on preset guidelines. . . . Each registered Broadcast Agent, that is *everyone who* is allowed to create Broadcasts, has a separate Profile recorded in the Administration Database. . . . All Broadcast Agents belong to a Broadcast Agent Administrator, and *may not have authority exceeding* their Broadcast Agent Administrator.").

Defendants' proposed construction also comports with the plain and ordinary meaning of the word "agent," as shown by extrinsic evidence defining agent as "one" or a person.  For instance, the Oxford English Dictionary defines "agent" as "[o]ne who does the *actual work* of anything, as distinguished from the instigator or employer."  *Oxford English Dictionary*, attached as Exhibit 16, 248 (2d ed. 1989) (emphasis original); *see also American Heritage Dictionary of the English Language*, attached as Exhibit 17, at 32 (4th ed. 2000) (defining "agent " to mean

"[o]ne that acts or has the power or authority to act."); *Webster's Third New International Dictionary*, attached as Exhibit 18, at 40 (3d ed. 2002) (defining agent as "one" who "acts or exerts power" or "acts or performs an act," or alternatively as "a *person* responsible for *his* act or acts.").

Defendants' plain-meaning construction for the "broadcast agent" and "broadcast message originator" terms is consistent with their usage in the asserted patents, and how a person of ordinary skill would understand that term in view of the intrinsic evidence. *See Phillips*, 415 F.3d at 1315–17. The inventors did not redefine "broadcast agent" and "broadcast message originator," nor did they clearly and unmistakably disavow the full scope of the term. *See Thorner*, 669 F.3d at 1366–67. Accordingly, the Court should adopt Defendants' proposed construction.

### E. "Broadcast message originator identifier"

| "Broadcast message originator identifier" | | |
|---|---|---|
| **CLAIMS** | **DEFENDANTS' CONSTRUCTION** | **PLAINTIFFS' CONSTRUCTION** |
| **'938 patent**: 1<br>**'719 patent**: 14<br>**'212 patent**: 13 | a piece of information identifying the broadcast message originator (as construed) | information that identifies the broadcast message originator (as construed) |

The parties' dispute concerning the "broadcast message originator identifier" claim term is whether the identifier must be a single piece of information (as Defendants propose) or information generally (as Plaintiffs propose). The specifications indicate that the identifier is one piece of information—specifically, a "User ID/Agent ID": the "Fetch User Profile or Fetch Agent Profile process 304 provides that the ***User ID/Agent ID is read*** and the Broadcast Agent profile is fetched from the Administration Data Base such as account data database 216." '938 patent at 24:8–11. The specifications also disclose that using "a graphical user interface (GUI) 400, or similar user interface . . . [t]he user will have first entered his userID and password

22

before access is allowed. The PLBS system 100 can display a map to the Broadcast Agent as a function of *the user ID* and his authorized jurisdiction." '938 patent at 29:11–25.  These statements indicate that the Broadcast Agent's user ID it the single piece of information used by the disclosed systems and methods to identify the Broadcast Agent.  Nothing in the intrinsic evidence suggests that the "broadcast message originator identifier" is anything other than a single piece of information used to identify the broadcast agent—the broadcast originator's/broadcast agent's user ID.  *See Microsoft*, 357 F.3d at 1347-49 (construing claims according to their "repeated and consistent" description in the specification).

F.    **"Broadcast message originator parameter"**

| "Broadcast message originator parameter" | | |
|---|---|---|
| **CLAIMS** | **DEFENDANTS' CONSTRUCTION** | **PLAINTIFFS' CONSTRUCTION** |
| **'938 patent**: 12, 13, 42 **'719 patent**: 23, 27 | information associated with the broadcast message originator (as construed) | information regarding the broadcast message originator (as construed) |

Just as with the "broadcast originator identifier" term, the parties' dispute for the "broadcast message originator parameter" term is a narrow one:  whether the parameter should be "associated with" the broadcast message originator, as Defendants propose, or merely "regarding" the originator, as Plaintiffs propose.

The specifications disclose "the web portal 202 receives from the account data database 216 through the Administration Subsystem 203 the Broadcast Agent (BA) profile 204 for each message entered for broadcast delivery." '938 patent at 12:31-56.  The Broadcast Agent profile "can include any variety of user definable parameters and limits," such as "a set of user parameters 206, broadcast target area footprint parameters 208, message parameters 210, and/or status register parameters 212." *Id.*  The specifications disclose that "[t]he user parameter 206 can include authorizations or limitations related to the Broadcast Agent"; "[t]he footprint

23

parameters 208 can include one or more geographic areas or locations in which the Broadcast Agent has defined for broad message delivery (broadcast target area) or a selection of a predefined broadcast target area"; and "[t]he message parameters 210 can include limits or specification for each proposed message or on the total number of authorized messages or time limits for delivery of the message." *Id*. Moreover, the specifications disclose that "An account data database 216 can also provide stored information related to one or more accounts or Broadcast Agents utilizing or accessing the service bureau 102." *Id.* at 13:16-22. Because the specifications tie all these parameters to the Broadcast Agent, Defendants' proposal uses the more definite term "associated with" to describe the relationship between the information and the broadcast message originator, while Plaintiffs' proposal uses the looser term "regarding." *See Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning.").

Plaintiffs propose essentially the same construction for "broadcast message originator identifier" (*i.e.*, "information that identifies") and "broadcast message originator parameter" (*i.e.*, "information regarding"). Plaintiffs' proposal violates the doctrine of claim differentiation by making, for example, claim 1 of the '938 patent redundant of the language of dependent claim 12 in the same patent. *See Phillips*, 415 F.3d at 1324-25 ("The inclusion of such a specific limitation on the term 'baffles' in claim 2 makes it likely that the patentee did not contemplate that the term 'baffles' [as recited in claim 1] already contained that limitation."). Dependent claim 12 is "presumptively different in scope" than independent claim 1, which lacks the

24

"parameter" term. *See Wenger Mfg. v. Coating Machinery Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001). Indeed, the only meaningful difference between the two claims is the additional "parameter" limitation of claim 12, making the presumption that "identifier" and "parameter" have different meanings "especially strong." *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). Accordingly, Plaintiffs' proposal ascribing the same meaning to both terms is legally improper and should not be adopted by the Court. *See SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 431 (Fed. Cir. 2016) ("data channel" and "data feed" could not be construed the same where, *inter alia*, "data channel" was found in independent claim 1 and "data feed" was found in dependent claims).[11]

In contrast to Plaintiffs' proposal, Defendants properly gives distinct meanings to "identifier" and "parameter." Defendants' proposed constructions are also supported by the intrinsic record. The asserted claims and specifications describe that "the broadcast message originator parameter includes one or more of an authorized broadcast message originator identification code." *See, e.g.*, '938 patent at claim 13, 19:3-14; *see also id.* at 24:8-11 (referring to User ID and Agent ID), 29:11-25 (referring to userID and password). Thus, the asserted patents distinguish between the parameter and more specific identifying information, such as an identification code or user ID. In this context, a person of ordinary skill in the art would understand the "identifier" to refer to specific identifying information or a "piece of information," as opposed to the more general "parameter" that is any information associated with the originator.

G.    **"Common Alerting Protocol (CAP)"**

| CLAIMS | DEFENDANTS' | PLAINTIFFS' |
| --- | --- | --- |

---

[11] Because "the same claim term in the same patent or related patents carries the same construed meaning," this analysis supports rejecting Plaintiffs' constructions of these terms in the other asserted patents. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

| | CONSTRUCTION | CONSTRUCTION |
|---|---|---|
| **'212 patent**: 20 | the OASIS Common Alerting Protocol standard versions publicly known as of November 2005 | the protocol defined in the OASIS Common Alerting Protocol standard |

The parties agree that this term refers to the OASIS CAP standard.  The parties disagree, however, on whether this claim term should include a temporal aspect.  Courts construe a claim term to have "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13.  Indeed, the CAP standard has changed over time.  *See* CAP v1.2 (Exhibit 11) at Appendix C; CAP v1.1 (Exhibit 19) at Appendix C.  Defendants' proposal therefore properly links the claim term "Common Alerting Protocol (CAP)" to the specific protocol known at the time of the filing date of the provisional application (Ser. No. 60/739,819) to which the '212 patent claims priority, November 23, 2005.[12]  *See Vizio, Inc. v. ITC*, 605 F.3d 1330, 1336-1337 (Fed. Cir. 2010) (construing "channel map information" consistent with MPEG-2 industry standard in effect at time of patent filing); *Promethean Insulation Tech. LLC v. Sealed Air Corp.*, No. 2:13-cv-1113-JRG-RSP, 2015 WL 11027039, at *1-2 (E.D. Tex. Oct. 25, 2015) (construing "Class A" to mean such class as determined using an industry standard in effect as of the filing date of the patent).

---

[12] In contrast, Provisional Application Ser. No. 60/544,739, which was filed on February 13, 2004, and to which the asserted '221 and '954 patents claim priority, does not describe CAP. *See New Railhead Mfg., LLC v. Vermeer Mfg.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002) (describing that "the written description of the provisional must adequately support the claims of the non-provisional application"); *See also Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991) (describing the written description requirement).

H.    **"Generating a validated broadcast message record"**

| CLAIMS | DEFENDANTS' CONSTRUCTION | PLAINTIFFS' CONSTRUCTION |
|---|---|---|
| **'938 patent**: 1<br>**'719 patent**: 14<br>**'212 patent**: 13 | after validating, creating a broadcast message record (as construed) that further includes data indicating successful validation | creating a broadcast message record (as construed) which the system or method has determined to be valid |

The parties largely agree on the construction of "generating a validated broadcast message record."  First, the parties agree that the "generating" portion of the claim term means "creating," which is consistent with plain meaning of the term,[13] as well as the way other courts have construed similar patent terms.[14]  Second, the parties agree that the "validated broadcast message record" portion of the claim term requires that the system has already validated the broadcast message before generating the validated message record.  Although Defendants' proposed construction expressly states that the generating function occurs "after validating," this appears materially the same as Plaintiffs' proposal that the broadcast message record is one that the "system or method has determined to be valid."

Where the parties differ is on whether the "validated broadcast message record" includes data indicating such validation.  Here, the claims and specification show that Defendants'

---

[13] *See Oxford English Dictionary*, Exhibit 16, at 435 (defining "generate" as "to produce" in various contexts); *American Heritage Dictionary of the English Language*, Exhibit 16, at 732 (defining "generate" as "to bring into being" or "to produce"); *Webster's Third New International Dictionary*, Exhibit 18, at 945 (defining "generate" as to "produce" or "to originate").

[14] *See, e.g.*, *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1361-63 (Fed. Cir. 2014) (affirming construction of "generating said supplied file" as "creating or tailoring a file . . ."); *Ameranth, Inc. v. Menusoft Sys. Corp.*, No. 2-07-CV-271, 2010 WL 1610079, at *5-7 (E.D. Tex. Apr. 21, 2010) (construing "generating" in several terms to mean "creating"); *Telcordia Techs., Inc. v. Alcatel USA, Inc.*, No. 04-874-GMS, 2006 WL 6258253, at *4 (D. Del. June 22, 2006) (construing "generating a bit stream" to mean "creating either serial or parallel bit streams").

proposal requiring the inclusion of such data is correct. The "generating" term appears in the asserted patents in the following context:

> a broadcast admission control module configured for receiving the broadcast message record [and] validating the broadcast message record . . ., said broadcast admission control module configured for generating a validated broadcast message record as a function of the validating.

'938 patent at cl. 1; *see also* '719 patent at cl. 14 (directed to a step of "generating a validated broadcast message record as a function of the validating"); '212 patent at cl. 13 (same). According to the claims, therefore, the "generating" function is performed by the broadcast admission control module. The specification, in turn, explains that the broadcast admission control module is capable of generating reports regarding the broadcast messages sent via the system. *See* '938 patent at 13:23-32 ("Admission control 220 receives the message request that contains the proposed message as well as the broadcast target area. A Report Subsystem 222 generates reports for administration and operator review. Such reports can be stored and/or logged in the logfile 214."). These reports include validation data, such as reporting when a message was declined. *Id.* at 16:12-18, 16:33-36. Similarly, the module can create a "check list of flags that are used by the system to track the progress of each Broadcast Request." *Id.* at 17:1-8. In other words, the purpose of generating the validated broadcast message record is to enable tracking of the status of each broadcast message request, i.e., whether the message was successfully validated and transmitted. The "generating" term must therefore incorporate the creation of data indicating whether validation has occurred to fulfill the function as described in the specification. Accordingly, the Court should adopt Defendants' proposed construction of the "generating" term.

I.    **Claims 1 and 11-13 of the '938 Patent Are Invalid As Indefinite, Because The "Module" Terms Lack The Necessary Corresponding Structure.**

Independent claim 1 of the '938 patent recites at least two purely functional limitations in the form of "module configured for [performing a specified function]":

- "a broadcast admission control module configured for receiving the broadcast message record, validating the broadcast message record as a function one or more of the broadcast message originator identifier, the broadcast target area, and a broadcast message transmission network parameter associated with a broadcast transmission network adapted for broadcasting the message to at least a portion of the broadcast target area, said broadcast admission control module configured for generating a validated broadcast message record as a function of the validating." '938 patent at 39:27-37.

- "a broadcast message distributor module configured for receiving the validated broadcast message record and transmitting the broadcast message and the broadcast target area, or a part thereof, to an output interface configured for distributing the broadcast message to at least a portion of the broadcast target area." '938 patent at 39:38-43.

To start, the parties dispute whether these claim terms are governed by 35 U.S.C. § 112, ¶ 6.

By its terms, 35 U.S.C. § 112, ¶ 6, governs the construction of claim terms that (1) recite one or more functions, and (2) fail to recite structure in support of that function. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015); 35 U.S.C. § 112, ¶ 6 (permitting claiming "a means or step for performing a specified function without the recital of structure . . ."). While the statute refers to the words "means for," those words are not required for a term to be subject to 35 U.S.C. § 112, ¶ 6. Rather, where a term does not recite the words "means

29

for," there is a rebuttable presumption that § 112, ¶ 6 does not apply. *See Williamson*, 792 F.3d at 1348. The presumption can be overcome if the claim term fails to "recite sufficiently definite structure" or recites "function without reciting sufficient structure for performing that function." *Id.* at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000). Construction of such a means-plus-function limitation has two steps. "First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (internal citations omitted).

While a patentee may elect to use functional language instead of structure, there is a *quid pro quo*: To enjoy the convenience of functional language, the patentee must disclose and clearly link in the specification sufficient structure to perform the functions recited in the claims. *See id.* at 1318. In cases like this one that involves a computer-implemented invention, the corresponding structure must be "more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Instead, the corresponding structure required to be disclosed is an algorithm[15] for performing the claimed function. *Id.*; *see also Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008) (describing that simply disclosing software "without providing some detail about the means to accomplish the function is not enough"). Likewise, where a disclosed

---

[15] An algorithm—a step-by-step procedure for accomplishing a given result—may be expressed in a variety of ways, but at base, the specification must explain how the software performs the claimed function. *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318-19 (Fed. Cir. 2013) (finding flow charts insufficient structure); *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012); *see also Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013) (defining an algorithm as "a sequence of computational steps to follow").

algorithm supports some, but not all, of the functions associated with a means-plus-function limitation, it is "as if no algorithm has been disclosed at all." *Noah Sys.*, 675 F.3d at 1318-19. If the claims fail to provide sufficient structure (*i.e.*, the required algorithms), they are invalid for indefiniteness under § 112, ¶ 2. *See, e.g.*, *Aristocrat*, 521 F.3d at 1337-38.

In the '938 patent, the "module" terms in independent claim 1 fail to recite sufficient structure for performing the functions required by those terms, and thus are subject to 35 U.S.C. § 112, ¶ 6—specifically, (1) "validating the broadcast message record as a function one or more of the broadcast message originator identifier, the broadcast target area, and a broadcast message transmission network parameter associated with a broadcast transmission network adapted for broadcasting the message to at least a portion of the broadcast target area"; (2) "generating a validated broadcast message record as a function of the validating"; (3) "receiving the validated broadcast message record "; and (4) "transmitting the broadcast message and the broadcast target area, or a part thereof, to an output interface configured for distributing the broadcast message to at least a portion of the broadcast target area."

### 1.    "broadcast admission control module"

Like the "distributed learning control module" in *Williamson,* the "broadcast admission control module" is a black box, defined entirely by function with no structure whatsoever, let alone structure for performing the various and complex functions recited in the claim term. *See Williamson*, 792 F.3d at 1350. The claim term "module for"[16] in the context of computer-implemented inventions "is a well-known nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6." *Id*. The phrases "broadcast admission control" and the "broadcast message distributor" merely describe differences between the modules; they are not

---

[16] Indeed, the term "module" is simply a generic description for software or hardware to perform a specified function. *See* Microsoft Dictionary (5th ed.) (attached as Exhibit 20) at 346 (defining "module" in functional terms in software and hardware contexts).

structure.  The claim is silent on the structure that achieves the functions of the "broadcast admission control model" limitation.  This lack of any structure in the claim, let alone sufficient structure to perform the recited functions, is sufficient to overcome the presumption, and therefore the term is subject to § 112, ¶ 6.

> **(a)**    ***The recited functions of the "broadcast admission control module" term.***

Assuming the two "module" terms are means-plus-function terms, the parties agree that the corresponding functions for the "broadcast admission control module" are:

1.  receiving the broadcast message record,

2.  validating the broadcast message record as a function one or more of the broadcast message originator identifier, the broadcast target area, and a broadcast  message transmission network parameter associated with a broadcast transmission network adapted for broadcasting the message to at least a portion of the broadcast target area, [*said broadcast admission control module configured for*]

3.  generating a validated broadcast message record as a function of the validating.

> **(b)**    ***The asserted patents fail to disclose corresponding structure for the "broadcast access control module."***

Where there are multiple claimed functions, like for the "broadcast access control module," "the patentee must disclose adequate corresponding structure to perform *all* of the claimed functions."  *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) (emphasis original); *see also Noah Sys.*, 675 F.3d at 1318.  Here, the '938 patent specification fails to disclose any corresponding structure for performing *all* the recited functions of the "broadcast access control model."

Plaintiffs allege the "software of the Admission Control Subsystem (element 220 of Figure 2) executing on the Broadcast Broker Server (element 102 of Figure 1)" is corresponding

structure for the "broadcast admission control module." Dkt. No. 48 at 4. Using the chart below, Defendants address, in turn, why the identified structure fails to satisfy this requirement for the "broadcast admission control module."

| Recited Functions | Ps' Identified Structure |
|---|---|
| [1] receiving the broadcast message record | Step 302<br>24:1 – 26:4 |
| [2] validating the broadcast message record as a function one or more of the broadcast message originator identifier, the broadcast target area, and a broadcast message transmission network parameter associated with a broadcast transmission network adapted for broadcasting the message to at least a portion of the broadcast target area, | Steps 304-340<br>24:1-25:55 |
| [3] generating a validated broadcast message record as a function of the validating | Step 342<br>25:56-65 |

Although Defendants generally agree that any corresponding structure would be implemented in "software,"[17] disclosing software is not enough; the '938 patent specification must disclose an algorithm for performing each of the recited functions of the term. *Noah Sys.*, 675 F.3d at 1312. None of the passages Plaintiffs cite from the specification disclose any structure for performing these functions because they fail to describe the steps the software implemented by the broadcast admission control module would take to perform those functions, which is tantamount to disclosing no algorithm at all. *See Function Media*, 708 F.3d at 1318-19; *Noah Sys.*, 675 F.3d at 1318-19.

As indicated in the table above, Plaintiffs alleged that certain steps illustrated in Figure 3 (which illustrates "admission control method 300," known as "the Haslemere Algorithm") and corresponding portions of the Specification provide sufficient disclosure to be considered corresponding structure for the "broadcast access control module." *See* Dkt. No. 48 (citing Steps

---

[17] As such, the difference between Defendants' proposed "general purpose computer and a network of general purpose computers" and Plaintiffs' proposed "Broadcast Broker Server (element 102 of Figure 1)" is immaterial. Dkt. No. 48 at 4.

302-342 and 24:1-26:4).  They do not.  As explained below, the disclosed "Haslemere

Algorithm" fails to describe how the software performs all three recited functions of the

broadcast admission control module.

 The "validating" function of the "broadcast access control module" recites "validating the

broadcast message record as a function one or more of the broadcast message originator

identifier, the broadcast target area, and a broadcast  message transmission network parameter

associated with a broadcast transmission network adapted for broadcasting the message to at

least a portion of the broadcast target area,"  Hence, any corresponding algorithm for this

function in the specification must disclose of how to validate "the broadcast message record" as

a function of one or more of three items: 1) "the broadcast message originator identifier," 2) "the

broadcast target area," and 3) "a broadcast message transmission network parameter associated

with a broadcast transmission network adapted for broadcasting the message to at least a portion

of the broadcast target area."  In checking "the User ID" against "the password and

authentication key entered in the [Administration Data Base, account database 216]," the

specification may describe "validating a broadcast message record as a function of  . . . the

broadcast message originator identifier."  '938 patent at 24:8-28.  Yet the two-plus columns of

text relied upon by Plaintiffs fails to describe how the software validates as a function of "the

broadcast target area," let alone any "area."  *See id.* at 23:62-25:26:4.

 The specification also fails to describe "validating" as a function of "a broadcast message

transmission network parameter associated with a broadcast transmission network adapted for

broadcasting the message to at least a portion of the broadcast target area."  Instead, the

specification describes only that "the Broadcast Message Request is examined to see which is the

first network to be attempted.  The Admission Parameters for this network will now be queried

from the Administration Data Base or from the account data database 216 and examined." *Id.* at 24:31-34. "Admission Parameters" is not otherwise used or described in the patent. Thus, the specification's description that the "Admission Parameters" are "queried" and "examined" does not describe *how* the software validates based on the claimed "a broadcast message transmission network parameter associated with a broadcast transmission network adapted for broadcasting the message to at least a portion of the broadcast target area."

Furthermore, because "one or more of" denotes that the "validating" function requires only one of the listed items that follows, any corresponding support for the "validating" would necessarily describe validating based on any one of the recited "broadcast message originator identifier," "broadcast target area," or "a broadcast message transmission network parameter." *See*, *e.g.*, *Joao Bock Transaction Systems, LLC v. First Nat. Bank*, No. 11 C 6472, 2013 WL 3199981, at *6-7 (N.D. Ill. June 24, 2013) (construing "one of . . . and . . ." to mean "one or more of the items in the list" or "either or both of the items in the list"). The portions of the specification on which Plaintiffs rely describes that validating, or "admission control," is a function of a *combination of* factors, including User ID, password and authentication key ('938 patent at 24:8-14); "Admission Parameters" (*id.* at 24:29-42); an "end of file marker" (*id.* at 24:43-45); other "parameters" (*see*, *e.g.*, *id.* at 24:62-25:14); and various flags (*see*, *e.g.*, *id.* at 24:25-28, 24:46, 24:51). In this same passage, there is no disclosure of "validating" only based on one item. Therefore, the specification fails to disclose an algorithm that describes how the software performs the "validating" function of the claimed "broadcast admission control module."

The patent also fails to disclose how the software performs the "receiving" and "generating" functions. For example, as to the "receiving" function, although the method begins

at a "Next Broadcast Agent Message Request (BR) process 302" in which "BR messages are held in a message queue 346 and may be received from broadcast agents on site or from a remote Broadcast Agent System." '938 patent at 24:1-4.  As to the claimed "generating" function, Step 342 (as described in the Specification) does not describe how "a validated broadcast message record" is generated "as a function of the validating."  *See id.* at 25:56-65.  The cited passage states only that, "if the broadcast message has not been declined for the particular network, then the message is passed on to a Copy to Broadcast request Distributor 342 process."  *Id.* at 25:56-58.  Therefore, this function falls with the "validating" function, which as discussed previously, is not described in the specification.

Turning to the second disputed "module" term, Defendants disagree that the specification discloses algorithms describing how the software allegedly performs the two recited functions.

### 2.    "broadcast message distributor module"

Because claim 1 fails to recite any structure for performing recited functions of the "broadcast message distributor module" limitation, this claim term is subject to § 112, ¶ 6.

### (a)    The recited functions of the "broadcast message distributor module" term

The parties disagree, however, as to the corresponding functions of the "broadcast message distributor module," as represented below:

| Defendants | Plaintiffs |
|---|---|
| [1] receiving the validated broadcast message record and<br><br>[2] transmitting the broadcast message and the broadcast target area, or a part thereof, to an output interface configured for distributing the broadcast message to at least a portion of the broadcast target area | [1] receiving the validated broadcast message record and transmitting the broadcast message and the broadcast target area, or a part thereof, to an output interface |

36

Reading the claim, it is clear that the "broadcast message distributor" performs two distinct functions: [1] receiving the validated broadcast message; and [2] transmitting the broadcast message and the broadcast target area, or a part thereof to an output interface configured for distributing the broadcast message to at least a portion of the broadcast target area. "Receiving" and "transmitting" are clearly two different functions, so it is improper to group them together. Moreover, Plaintiffs' proposal incorrectly omits that the output interface is "configured for distributing the broadcast message to at least a portion of the broadcast target area." *See Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) (finding that the recited function "must be construed to include the limitations contained in the claim language"). Accordingly, it is respectfully submitted that "broadcast message distributor module" should be interpreted as reciting the two functions.

### (b)    *The asserted patents fail to disclose corresponding structure for the "broadcast message distributor module."*

Plaintiffs allege the "software of the distributor module (element 224 of Figure 2), which executes on the Broadcast Broker Server (element 102 of Figure 1)" provides sufficient disclosure for the "broadcast message distributor module." Dkt. No. 48 at 6. Using the chart below, Defendants address, in turn, why the structure identified by Plaintiffs fails to satisfy this requirement for the "broadcast message distributor module."

| Recited Functions | Ps' Identified Structure |
|---|---|
| [1] receiving the validated broadcast message record and | 13:33-43, 14:6-37 |
| [2] transmitting the broadcast message and the broadcast target area, or a part thereof, to an output interface configured for distributing the broadcast message to at least a portion of the broadcast target area | 13:33-50, 14:6-37, and 14:48-65 |

Contrary to Plaintiffs' assertions, however, the '938 patent fails to describe how the software performs all of the claimed functions of the broadcast message distributor module,

which is tantamount to disclosing no algorithm at all. *See Function Media*, 708 F.3d at 1318-19; *Noah Sys.*, 675 F.3d at 1318-19. There is no flow chart describing the operation of the distributor module, which is identified at feature 224 in Figure 2. Instead, the specification describes the operation of the "Distributor 224" in general terms. *See* '938 patent at 13:33-46. Plaintiffs appear to suggest that an isolated mention of "The Presswood Algorithm" (*see id.* at 13:43-46), which is not illustrated in the patent, is sufficient disclosure under 35 U.S.C. § 112, ¶ 6. It is not. As explained below, the specification (including any discussion of the "Presswood Algorithm"), fails to describe how the software performs both recited functions of the broadcast message distributor module.

The "transmitting" function of the "broadcast message distributor module" requires transmitting "the broadcast message and the broadcast target area, or a part [of the broadcast target area] to an output interface configured for distributing the broadcast message to at least a portion of the broadcast target area." '938 patent at 39:40-41. With respect to "transmitting the broadcast message and the broadcast target area . . . to an output interface," the passages of the specification identified by Plaintiffs describe only that the "Distributor 224 . . . maps the Broadcast Agent's broadcast target area to determine which broadcast networks 112 or network service providers have networks providing broadcast distribution systems serving the broadcast target area." *Id.* at 13:33-37; *see also id.* at 14:10-12 (describing that the distributor "identifies the networks providing service to the broadcast target area for the requested message"). Nowhere does the specification describe how the distributor "maps" the target area or "determines" which networks or service providers serve the target area. In other words, the specification lacks any disclosure of how the software (of the distributor module or otherwise) uses the desired target area for a message to identify which networks or service providers to

transmit the message to.  Thus, the specification fails to disclose an algorithm for the recited "transmitting" function of the claimed broadcast message distributor module.

Moreover, it appears Plaintiffs allege that the claimed "transmitting" function involves either a "CBE-CBC interface 226" or a "remote selector 228" that must be appropriately configured "for distributing the broadcast message to at least a portion of the broadcast target area," as claimed.  Specifically, in one embodiment, the "distributor 224 sends the broadcast message along with a coordinate-defined broadcast target area over the CBE-CBC interface 226 to the appropriate cell broadcast centers 114."  '938 patent at 14:12-15.  In the other embodiment, the "remote selector 228 receives the network addressed broadcast message and delivers the message using the network addresses to the associated broadcast facility."  *Id.* at 14:33-37.  Generally speaking, the "Presswood Algorithm is used to determine each transmission network's interface components and determines the appropriate communications protocol for each CBC." *Id.* at 13:43-46.  But there is no disclosure of the "Presswood Algorithm," nor any suggestion that this algorithm would be well-known to one of ordinary skill in the art at the time.  Nor is there disclosure, as to how the remote selector is configured to "distribut[e] the broadcast message to at least a portion of the broadcast target area," as required by the claim.  Therefore, the specification does contain sufficient disclosure regarding the "output interface configured for distributing the broadcast message to at least a portion of the broadcast target area," which is recited within the "transmitting" function of the claimed broadcast message distributor module.

Lastly, the specification does not describe how the software "receiv[es] the validated broadcast message record."  Instead, the Specification describes only that the "Distributor 224 receives the broadcast message request," and that "[t]he service bureau 102 receives the message profile 204."  *Id.* at 13:33-34; 14:7-10.  The Specification does not describe how the broadcast

message request or message profile is received.  Especially in view of Plaintiffs' proposed construction of "broadcast message record," which would require "a populated data structure that includes a broadcast message [as construed] and associated information," more than a microprocessor or general computer is required for the claimed "receiving the validated broadcast message record" function.  *See EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015) ("A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm.").  Therefore, the specification fails to disclose algorithms showing how software would perform either function of the "broadcast message distributor module."  At best, the specification merely "describes an outcome, not a means for achieving that outcome."  *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009) (quoting *Aristocrat Techs.*, 521 F.3d at 1334).

Accordingly, having found that the "module" limitations are means-plus-function limitations lacking corresponding structure (*i.e.*, algorithms) in the specification, Defendants respectfully submit that Claim 1 of the '938 patent are invalid as indefinite.  *See Noah Sys.*, 675 F.3d at 1311-12.  Asserted dependent claims 11-13 would similarly be invalid.  *See Blackboard*, 574 F.3d at 1382.

## VI.    CONCLUSION

For the foregoing reasons, the Court should adopt Defendants' proposed constructions of the disputed terms.

40

Respectfully submitted,

Mark J. Abate
Calvin E. Wingfield Jr.
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 813-8000
Fax: (212) 355-3333
*mabate@goodwinprocter.com*
*cwingfield@goodwinprocter.com*

*Counsel for International Business
Machines Corporation*

CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director

*s/Nicholas J. Kim*
NICHOLAS J. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
*Nicholas.J.Kim@usdoj.gov*
T: (202) 616-8116
F: (202) 307-0345

*Attorneys for the United States*